United States District Court
District of Massachusetts

| | |
|---|---|
| UNITED STATES of AMERICA, ) ) v. ) ) QUANTAE ELMORE, ) ) Defendant. ) ) | Criminal Action No. 18-10243-NMG |

**MEMORANDUM & ORDER**

**GORTON, J.**

Defendant Quantae Elmore ("Elmore" or "defendant") has been indicted on one count of Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. § 922(g)(1). The indictment also includes a criminal forfeiture allegation.

Before the Court is defendant's motion to suppress a loaded gun and ammunition obtained during a <u>Terry</u> stop and frisk in May, 2018. For the reasons that follow, that motion will be denied.

## I. Background

### A. The Earlier Shootings

In the early morning of May 4, 2018, a member of the Orchard Park ("OP") gang was shot. A subsequent investigation of that shooting by officers revealed that there was a potential split between the OP and Heath Street ("HS") gangs which had previously been aligned.

-1-

Around 9:40 P.M. that evening, several people were shot inside a housing complex in Jamaica Plain that was frequented by HS members. As a result of the two shootings, four police officers from the Boston Police Department's Youth Violence Strike Force were sent to patrol the Orchard Gardens Housing Development in Roxbury's Dudley Square. That area is associated with the OP gang. The officers were sent to investigate OP's possible connection to the shooting in Jamaica Plain.

    **B. The Police Officers' Observations and Surveillance Video of the Stop and Frisk**

Around 9:55 P.M., the officers arrived at the Orchard Gardens Housing Development in an unmarked vehicle. They traveled along Ziegler Street in the direction of Winslow Street with their lights activated. As they passed Winslow Street, they noticed a white Scion with two African-American males identified as Geovonnie Mitchell ("Mitchell") and Alex Slaughter ("Slaughter") walking toward the car. The officers knew Mitchell was a member of OP.

The officers briefly stopped their vehicle next to the white Scion but then continued down Ziegler Street. At about that time, the officers were informed, via radio transmission, that a small white vehicle occupied by an African-American male was seen speeding away from the Jamaica Plain shooting 15 minutes earlier. Another transmission over a different channel

broadcast noted that the suspect was seen wearing a grey hooded sweatshirt but Officer Antoine Ramos ("Officer Ramos"), who was driving the police cruiser, testified that he was unaware of that detail that night. The officers circled back around the block to investigate the white Scion and the individuals of interest.

A surveillance video shows that shortly after the officers made their initial pass on Ziegler Street, Elmore, an African-American male, was dropped off near the intersection of Dudley Street and Greenville Street by a friend. The video shows Elmore walking along Winslow Street toward Ziegler Street while talking on a cellphone. He was wearing a black T-shirt and khaki pants but no sweatshirt. He was walking somewhat behind a group of other young men.

The group of men and Elmore then turned right onto Ziegler Street and approached the white Scion. Elmore stopped next to the car and Slaughter opened the passenger door. Elmore leaned inside the vehicle while still talking on his cellphone. The group was still gathered around the Scion when the unmarked cruiser turned back onto Ziegler Street and Officer Ramos immediately activated the lights as they approached the car.

Officer Ramos contends that he observed a group of known OP and Vine and Forest Street ("VnF") gang members surrounding the Scion. He also credibly testified that he observed Elmore, who

he knew from prior encounters with police, standing next to the car. Officer Ramos knew Elmore to be a member of the VnF gang which was closely aligned with OP. He was also aware that Elmore had prior firearm arrests. Officer Ramos testifed that as the cruiser approached the Scion, he observed Elmore look at their vehicle with an alarmed expression and immediately grab at the front of his waistband.

According to Officer Ramos, Elmore then turned and walked away from the group of young men. The cruiser stopped directly behind the Scion and the officers immediately got out and approached the group. They were in plain clothes but wearing tactical vests with "Boston Police" displayed on the front. Most of the group of young men started walking back toward Winslow Street while Elmore continued in the opposite direction toward Bethune Street.

Officer Ramos testified and the surveillance video confirms that Elmore looked back at the officers several times as he walked away. According to Officer Ramos, Elmore made several more adjustments to the front waist area of his pants with one or both hands as he walked away. In his affidavit Elmore denies that he grabbed the front of his waistband but the surveillance videos show that three times Elmore had his left hand down near his front waistband while he held the cellphone in his right hand. It is unclear from the footage, however, whether Elmore

ever grabbed his front waistband with both hands during the encounter with the officers.

Based on his training, experience and knowledge of Elmore's criminal history, Officer Ramos suspected that Elmore was carrying a weapon. He testified that Elmore's grabbing of the front of his waistband was consistent with someone attempting to secure a firearm. Officer Ramos testified that he called out to Elmore as he walked, Elmore looked back, took a few more steps away from them and then stopped while still holding his cellphone in his right hand.

The surveillance video shows that Elmore reached a shaded area on the sidewalk next to a parked white truck. Although the next sequence is not visible in the video, Officer Ramos testified that Elmore then grabbed at his waistband again with both hands, said something to the effect of "oh, nah" and that Ramos then observed a bulge consistent with a gun in the front waist area of defendant. Based on what he saw, Officer Ramos approached Elmore to frisk him for a weapon. He testified that he reached for the front waistband of Elmore and felt what he knew to be a firearm. He then alerted the other officers to the presence of a firearm and he and another officer grabbed Elmore and took him to the ground as other officers approached. They placed Elmore in handcuffs and removed a loaded Smith & Wesson revolver from his waistband.

In August, 2018, defendant was indicted for being a felon in possession of a firearm. In March, 2019, he filed a motion to suppress the gun and ammunition.

**C.  The Parties' Arguments**

Elmore claims that the gun and ammunition were seized as a result of an unlawful stop and frisk. He contends that the officers lacked reasonable suspicion to stop or frisk him because 1) the surveillance video shows that he never grabbed at his waistband with both hands or otherwise acted suspiciously, 2) the officers stopped defendant primarily on the basis of his race and gender and 3) gang affiliation in a high-crime area is insufficient to provide reasonable suspicion for a Terry stop.

The government responds that the officers had reasonable suspicion to stop and frisk Elmore based on the following: 1) the two suspected gang-involved shootings earlier that day, including the one that had occurred only 15 minutes before the encounter; 2) Elmore's presence near a car matching the description of the vehicle seen at the most recent shooting; 3) his presence in a high-crime area linked to one of the gangs suspected to have been involved in the earlier shootings; 4) his criminal history and known gang affiliation; 5) his alarmed expression and sudden movement away from the suspect vehicle upon the officers' approach; and 6) his grabbing at his waistband several times throughout the police interaction.

## II. <u>Motion to Suppress</u>

### A. Legal Standard

Even without probable cause to make an arrest, police officers may conduct a brief investigatory stop for the purposes of crime prevention and detection. <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1, 22 (1968). Such encounters must be justified at their inception. <u>United States</u> v. <u>Pontoo</u>, 666 F.3d 20, 26 (1st Cir. 2011). They are justified if the officer has "reasonable, articulable suspicion that criminal activity is afoot." <u>United States</u> v. <u>Romain</u>, 393 F.3d 63, 71 (1st Cir. 2004).

> In making a reasonable-suspicion determination, a court must look at the totality of the circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing . . . . [O]fficers [may] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.

<u>United States</u> v. <u>Arvizu</u>, 534 U.S. 266, 273 (2002) (internal quotation marks and citations omitted); <u>United States</u> v. <u>Trullo</u>, 809 F.2d 108, 111 (1st Cir. 1987) (stating that "the circumstances before [the officer] are not to be dissected and viewed singly; rather they must be considered as a whole" (alteration in original) (citing <u>United States</u> v. <u>Magda</u>, 547 F.2d 756, 758 (2d Cir. 1976), <u>cert. denied</u>, 434 U.S. 878 (1977))). Although an officer must rely on more than a hunch,

the likelihood of criminal activity "need not rise to the level required for probable cause." Id.

A stop within the meaning of the Fourth Amendment occurs when police either physically restrain an individual or when an individual submits to a "show of authority" by an officer. United States v. Fields, 823 F.3d 20, 25 (1st Cir. 2016) (explaining that a show of authority occurs when an officer objectively communicates his or her intent to restrain the individual's freedom of movement and a reasonable person under the circumstances would have believed that he or she was not free to leave).

Once an individual is lawfully stopped, an officer may conduct a limited pat and frisk only if the officer has reasonable suspicion that the individual is armed and dangerous. United States v. Cardona-Vicente, 817 F.3d 823, 827 (1st Cir. 2016) (explaining that the constitutionality of a stop and of a subsequent frisk must be analyzed separately); see also Terry, 392 U.S. at 30-31 (holding that officers, upon reasonable suspicion, may "conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used" against them). The First Circuit Court of Appeals has recognized that where a lawful stop involves an unusually nervous individual suspected of unlawfully possessing a firearm, the officer is not required to have separate

justification to conduct a frisk. United States v. Belin, 868 F.3d 43, 49-50 (1st Cir. 2017).

If either the initial stop or subsequent frisk is unlawful, any weapons or evidence seized as a result thereof must be suppressed unless some exception to the exclusionary rule applies. United States v. Camacho, 661 F.3d 718, 728-29 (1st Cir. 2011).

**B.  Application**

The initial question is when the seizure of Elmore occurred for purposes of the Fourth Amendment.  It is clear that the seizure did not occur as soon as the officers got out of their vehicle and yelled to him.  At that moment, defendant was still walking away from the officers despite Officer Ramos's calls to him and thus he had not submitted to their show of authority. See California v. Hodari D., 499 U.S. 621, 625-26 (1991). Rather, the seizure occurred a few seconds later when defendant finally stopped walking away and turned back toward the officers in response to their commands.  The officers had clearly made a show of authority at that point by getting out of their cruiser with activated lights, chasing after Elmore and yelling at him to stop.  A reasonable person in that situation would not have felt free to leave.  Once Elmore finally submitted to that display of authority, he was "seized" for purposes of the Fourth Amendment.

The next issue is whether the officers had reasonable suspicion under the totality of the circumstances to stop defendant at that moment. The Court finds that they did. Defendant asserts that the officers primarily relied on his status as a young, African-American male who was present in a high-crime area to stop him for the suspected shooting. Those are not, however, the only facts that the officers relied upon.

The officers were investigating a series of shootings in which they suspected certain gangs to be involved. They saw known members of the suspected gangs surrounding a car that matched the description of the vehicle that had left the scene of the most recent shooting. They saw Elmore, who had a prior firearm arrest and was a known affiliate of the suspected gang, among the group of known gang members speaking to one of the individuals in the suspect vehicle. When the officers approached the group, Officer Ramos observed Elmore with an alarmed expression on his face immediately walk away from the group. Those facts, even without considering Officer Ramos's additional assertion that he saw defendant grab at his waistband several times, established a particularized, objective basis to stop Elmore and investigate his knowledge of the recent shooting. There was ample reasonable suspicion to subject Elmore to a <u>Terry</u> stop.

The closer issue is, however, whether the officers had reasonable suspicion to frisk Elmore after he was stopped. Although there are some discrepancies between the allegations contained in the police report and what happened at the scene, both according to Officer Ramos and the surveillance videos, the Court finds Officer Ramos's testimony to be credible. He testified that Elmore grabbed at his waistband several times as the officers approached the white Scion and after he walked away. The surveillance videos confirm that Elmore reached towards his waistband several times and Officer Ramos testified that defendant acted nervous, first exhibiting an unusually alarmed expression when the cruiser approached and then saying "oh, nah" several times when Officer Ramos called to him. Finally, Officer Ramos asserts that he saw a bulge in the front of Elmore's pants when defendant finally turned around. Those observations, combined with Officer Ramos's training and experience and other known facts, provided more than reasonable suspicion to frisk defendant for a weapon and thus that frisk was lawful.

## ORDER

For the foregoing reasons, defendant's motion to suppress (Docket No. 66) is **DENIED**.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated June 11, 2019